## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **8:06CR165** |
| Plaintiff, | ) | |
| | ) | **ORDER and** |
| vs. | ) | |
| | ) | **REPORT AND** |
| NORMAN WESLIN, | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

On May 17, 2006, the Grand Jury returned an indictment charging the defendant with one count of violating the Freedom of Access to Clinic Entrances Act, 18 U.S.C. §§ 248(a)(1) and 248(b)(2). The following motions are now pending before the court:

[20]   Defendant's Motion for Bill of Particulars
[18]   Defendant's Motion to Dismiss for Lack of Jurisdiction (Commerce Clause)
[24]   Defendant's Motion to Dismiss (First Amendment & Equal Protection)

Oral argument was held on November 1, 2006, and the motions have been fully briefed. The hearing transcript [32] was filed on November 24, 2006, at which time the motions were deemed submitted.

For the reasons discussed below, I find that the Motion for Bill of Particulars should be denied. I will also recommend that the Motions to Dismiss be denied.

## LEGAL ANALYSIS

The Freedom of Access to Clinic Entrances Act, 18 U.S.C. §§ 248 ("FACE Act") provides, in relevant part:

(a)   Prohibited activities.–Whoever–

(1)   by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services;
* * * *
shall be subject to the penalties provided in subsection (b) ....

(b)   Penalties.–Whoever violates this section shall–
* * * *
(2)   in the case of a second or subsequent offense after a prior conviction under this section, be fined in accordance with this title, or imprisoned not more than 3 years, or both[.]


## A.   Motion for Bill of Particulars[1]

The indictment alleges that, on or about April 24, 2006, the defendant,

by force, threat of force and physical obstruction, did intentionally intimidate and interfere with and attempt to intimidate and interfere with employees of the Bellevue Health Clinic d/b/a Abortion and Contraception Clinic of Nebraska from providing reproductive health services and patients of said clinic from obtaining reproductive health services in that the defendant, NORMAN WESLIN did:  (a) enter the clinic building and leaned against a doorway thereby preventing entry to and exit from the clinic building; (b) sit in front of the door making it difficult for employees and patients to get around him to enter the clinic; and (c) screamed at patients telling them not to enter the clinic.

The defendant contends that the government should be required to provide a bill of

particulars pursuant to Fed. R. Crim. P. 7(f), arguing that the allegations of the indictment

---

[1]The arguments of counsel concerning the Motion for Bill of Particulars are located at pages 31-36 of the Transcript [32].

do not give sufficient factual information as to the crime alleged. Specifically, the defendant complains that the individual patients and employees affected by the alleged conduct are not identified in the indictment.

The government has adopted an open file policy in this case. Accordingly, the defendant has been provided with interview reports[2] of four or five of the employees of the clinic who were affected by the defendant's activities on that day. The defendant has also been given the interview report of one named patient who was also there and affected by the defendant's activities. It was left to the clinic to contact any other patients to see if they would be willing to talk to the FBI about this incident. According to counsel, the U.S. Attorney's Office has not received any information from the FBI about additional patients who might be witnesses in this case.

Counsel proffered that the clinic workers will testify that there was a narrow hallway, an outer door, a vestibule, then an inner door to the clinic. In the middle of this hallway is a window that they could look out. When the workers could not get out the door from the clinic into the vestibule area, they looked through the window and found the defendant standing and leaning and pressing against this door preventing it from being opened. The

---

[2]Unless the individual witnesses consent, the government objects to providing their names to the defense because abortion protest groups, including that of the defendant, are known to go to the homes of such individuals, interfere with the particular persons, and also interfere with their families and children. I note that Fed. R. Crim. P. 16 does not require the government to provide this information before trial. Nor is the government under any duty or obligation to disclose cooperating witness Jencks Act material "until said witnesses testify on direct examination in the trial of the case." 18 U.S.C. § 3500(a).

defendant attempted to keep employees from the clinic from being able to get out and approach the patients and escort them into the building by pressing against the door and keeping it closed. When two employees were able to push the door open, he then sat or kneeled in the hallway.

"'A bill of particulars serves to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, [and] to avoid or minimize the danger of surprise at trial.'" *United States v. Shepard*, 462 F.3d 847, 860 (8th Cir. 2006), *cert. denied*, — S. Ct.—— , 2006 WL 3245008 (No. 06-7647, Dec. 11, 2006) (quoting *United States v. Hernandez,* 299 F.3d 984, 989-990 (8th Cir. 2002), *cert. denied,* 537 U.S. 1134 (2003)). Another purpose is to enable the defendant to plead an acquittal or conviction in bar of another prosecution for the same offense when the indictment is too vague and indefinite. *United States v. Hernandez*, 299 F.3d at 990. A bill of particulars "is not to be used for discovery purposes," *United States v. Shepard*, 462 F.3d at 860, and may not be used to provide detailed disclosure of the government's evidence. *United States v. Wessels*, 12 F.3d 746, 750 (8th Cir. 1993), *cert. denied*, 513 U.S. 831 (1994).

Considering the government's proffer and the arguments of counsel, I find the defendant has failed to demonstrate that a bill of particulars is required in this case to prevent unfair surprise at trial, or to protect the defendant from double jeopardy. The motion is denied.

**B.   Motion to Dismiss for Lack of Jurisdiction (Commerce Clause)**

The Constitution grants to Congress the power "[t]o regulate Commerce ... among the several States...."  U.S. Const., Art. I, § 8, cl. 3.  Under *United States v. Lopez*, 514 U.S. 549, 558-59 (1995), Congress can use its commerce power to regulate three categories of activity. Congress may regulate (1) the channels of interstate commerce; (2) the "instrumentalities" of interstate commerce, or persons or things in interstate commerce; (3) activities having a "substantial relation" to, or which "substantially affect," interstate commerce.  *Lopez*, 514 U.S. at 558-59.[3]

The defendant argues that there is no federal jurisdiction over this matter because Congress lacked authority under the Commerce Clause of the United States Constitution to enact the FACE Act.  Every legal authority that is binding on this court holds to the contrary.

In *United States v. Dinwiddie*, 76 F.3d 913, 919 (8th Cir.), *cert. denied*, 519 U.S. 1043 (1996), the court found that the FACE Act met all the requirements set in *United States v. Lopez*:

> In determining whether the conduct prohibited by FACE had a substantial effect on interstate commerce, our scope of review is limited. We must decide "whether a rational basis existed for concluding that [the] regulated activity

_____

[3]In *Lopez*, the Court held that the Gun-Free School Zones Act, which prohibited possession of a firearm in the vicinity of a school, *see* 18 U.S.C. § 922(q)(1)(A), was not a valid exercise of the commerce power. The government argued that the possession of a gun in a school zone leads to lower national productivity and, thus, less interstate commerce. The Court rejected the argument, finding that it would require the Court to "pile inference upon inference" to conclude that the conduct prohibited by the Gun-Free School Zones Act had a substantial effect on interstate commerce. *See* 514 U.S. at 567.

-5-

sufficiently affected interstate commerce." *Lopez,* [514 U.S. at 557]. The House Judiciary Committee and the Senate Labor and Human Resources Committee gathered evidence showing that the blockading of clinics and the use of violence and threats of violence against clinics' patients and staff depressed interstate commerce in reproductive-health services. H.R. Rep. No. 306, 103d Cong., 2d Sess. 8-9 (1993), *reprinted in* 1994 U.S. Code Cong. & Admin. News 699, 705-06; S. Rep. No. 117, at 31-32. It is settled law that the Commerce Clause gives Congress the power to regulate activity that diminishes interstate commerce in a good or service. See, *e.g., Katzenbach v. McClung,* 379 U.S. 294, 299-300 (1964) (Congress may regulate discrimination in restaurant services because, among other things, this discrimination reduces the amount of food purchased by restaurants); *Wickard* [*v. Filburn,* 317 U.S. 111, 128-29 (1942)] (the growing of wheat for home consumption reduces wheat sales and is, therefore, within the commerce power). Thus, there is a rational basis for concluding that the conduct prohibited by FACE substantially affects interstate commerce.

76 F.3d at 920 (parallel citations omitted); *accord United States v. Hart,* 212 F.3d 1067 (8th Cir. 2000), *cert. denied,* 531 U.S. 1114 (2001). The same conclusion was reached in a previous matter involving the defendant, i.e., *United States v. Weslin,* 156 F.3d 292 (2d Cir. 1998), *cert. denied,* 525 U.S. 1071 (1999); and also in *United States v. Bird,* 124 F.3d 667 (5th Cir. 1997), *cert. denied,* 523 U.S. 1006 (1998); *United States v. Gregg,* 226 F.3d 253 (3d Cir. 2000), *cert. denied,* 532 U.S. 971 (2001); *Norton v. Ashcroft,* 298 F.3d 547 (6th Cir. 2002), *cert. denied,* 537 U.S. 1172 (2003); *United States v. Bird,* 401 F.3d 633 (5th Cir.), *cert. denied,* 126 S. Ct. 150 (2005); and *United States v. Kopp,* No. 00CR0189, 2005 WL 839672 (W.D.N.Y., April 11, 2005).

Most recently, in *Scheidler v. National Organization for Women, Inc.*, 126 S. Ct. 1264 (2006), the Supreme Court held that the activities of certain abortion protesters did not fall within scope of the Hobbs Act, commenting that

> in 1994, Congress enacted a specific statute aimed directly at the type of abortion clinic violence and other activity at issue in this litigation, thereby suggesting it did not believe that the Hobbs Act already addressed that activity. *See* Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248(a)(3) (imposing criminal liability on anyone who "intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services").

*Scheidler*, 126 S. Ct. at 1273.

Notwithstanding the Eighth Circuit's precedent, and citing little or no persuasive authority on point, the defendant insists that his Commerce Clause argument must be revisited in light of the Supreme Court's decision in *United States v. Morrison*, 529 U.S. 598 (2006). This argument has been soundly rejected in other jurisdictions.

In *Morrison*, the Court held that Congress lacked authority under the Commerce Clause to enact the civil remedy provision of the Violence Against Women Act (VAWA),[4]

---

[4]The VAWA, 42 U.S.C. § 13981, provided that "[a]ll persons within the United States shall have the right to be free from crimes of violence motivated by gender." 42 U.S.C. § 13981(b). To enforce that right, subsection (c) provided:

A person (including a person who acts under color of any statute, ordinance, regulation, custom, or usage of any State) who commits a crime of violence motivated by gender and thus deprives another of the right declared in subsection (b) of this section shall be liable to the party injured, in an action for the recovery of compensatory and punitive damages, injunctive and declaratory relief, and such other relief as a court may deem appropriate.

-7-

rejecting "the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." 529 U.S. at 617-18.

The *Morrison* decision, elaborating on the third *Lopez* requirement, identifies four relevant considerations in determining whether activities "substantially affect" interstate commerce: "1) the economic nature of the activity; 2) a jurisdictional element limiting the reach of the law to a discrete set of activities that has an explicit connection with, or effect on, interstate commerce; 3) express congressional findings regarding the regulated activity's effects on interstate commerce; and (4) the link between the regulated activity and interstate commerce." *United States v. Gregg*, 226 F.3d at 262 (citing *Morrison*, 529 U.S. at 610-12).

The Third Circuit, in *Gregg*, held that the FACE Act satisfied these criteria and was not enacted in violation of the Commerce Clause:

> *Morrison* first asks a court to consider whether the federal law regulates intrastate economic or commercial activity. *See* 120 S. Ct. at 1750. In *Morrison,* the Supreme Court noted, "In every case where we have sustained federal regulation under *Wickard*'s aggregation principle, the regulated activity was of an apparent commercial character." *Id.* Accordingly, in *Morrison,* the Supreme Court invalidated the civil remedy provision of the Violence Against Women Act ("VAWA"), in part, because gender-motivated crimes "are not in any sense of the phrase, economic activity." 120 S.Ct. at 1751. In contrast to gender-motivated crime, the activity regulated by FACE–the physical obstruction and destruction of reproductive health clinics and the intentional interference and intimidation of persons obtaining and providing reproductive health services–is activity with an effect that is economic in nature. Reproductive health clinics are income-generating businesses that employ physicians and other staff to provide services and goods to their patients. Motivated by anti-abortion sentiment, the primary goal of individuals and groups engaged in the misconduct prohibited by FACE is to temporarily and permanently interrupt the operations of reproductive health facilities and

prevent individuals from accessing their services. *See* S. Rep. No. 103-117, at 11; H.R. Rep. No. 103-306, at 9, U.S.C.C.A.N., at 706. Congress found that the violent and obstructive acts directed at reproductive health facilities had caused millions of dollars of damage and forced clinics to close, caused serious and harmful delays in the provision of medical services and intimidated a number of physicians from offering abortion services. *See* S. Rep. No. 103-117, at 14; H.R. Rep. No. 103-306, at 7, U.S.C.C.A.N., at 704. The effect of the conduct proscribed by FACE is to deter, and in some cases to stop completely, the commercial activity of providing reproductive health services. We thus hold that although the connection to economic or commercial activity plays a central role in whether a law is valid under the Commerce Clause, we hold that economic activity can be understood in broad terms. Pursuant to this principle, unlike the activity prohibited by VAWA, the misconduct regulated by FACE, although not motivated by commercial concerns, has an effect which is, at its essence, economic. *See Weslin*, 156 F.3d at 296 (threats of violence that have the effect of deterring commercial activity is properly regulated under commerce clause); *Hoffman* [*v. Hunt*, 126 F.3d 575, 587 (4th Cir. 1997), *cert. denied*, 523 U.S. 1136 (1998)] (activity regulated by FACE, while not itself economic or commercial, "is closely and directly connected with an economic activity ... therefore ... we cannot conclude that FACE has nothing to do with commerce or any sort of economic enterprise"); *Dinwiddie*, 76 F.3d at 921 ("FACE prohibits interference with a commercial activity – the provision and receipt of reproductive health services."); *Cheffer* [*v. Reno*, 55 F.3d 1517, 1520 (11th Cir. 1995)] ("the Access Act does regulate commercial activity, the provision of reproductive health services.").

   *Morrison* next instructs a court to consider the existence of a jurisdictional element. 120 S.Ct. at 1750-51. "A jurisdictional element ... refers to a provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute." *United States v. Rodia,* 194 F.3d 465, 471 (3d Cir. 1999), *cert. denied*, 529 U.S. 1131 (2000). FACE does not contain an explicit jurisdictional element establishing that the federal cause of action is in pursuance of Congress's power to regulate interstate commerce. Although such an element would certainly lend support to the conclusion that FACE is tied to interstate commerce, we conclude that it was not necessary for Congress explicitly to limit the civil remedy provision in the case of regulating anti-abortion activity directed at reproductive health clinics that are, by definition, directly engaged in the business of providing reproductive health

services. *See Bird,* 124 F.3d at 675 (reasoning that a jurisdictional element is "not *always* a necessary" method to ensure that Congress does not exceed its commerce power).

*Morrison* also directs that the existence of congressional findings on the burden of the regulated activity on interstate commerce "may enable [a court] to evaluate the legislative judgment that the activity in question substantially affects interstate commerce." *Morrison,* 120 S.Ct. at 1752 (quoting *Lopez,* 514 U.S. at 563, 115 S.Ct. 1624). Congress's conclusion that the activity proscribed by FACE burdens interstate commerce is a conclusion derived from months of legislative hearings, research, and debate. The Senate Judiciary Committee and the House Committee on Labor and Human Resources which considered the legislation before it became law submitted extensive reports on the necessity of FACE. *See Bird*, 124 F.3d at 678. Thus, Congress's conclusion that FACE is constitutional is entitled to judicial deference. *See Parker*, 108 F.3d at 29.

Finally, in accordance with the fourth factor of *Morrison,* the findings set forth in the House and Senate Committee Reports demonstrate that Congress had a rational basis upon which to conclude that the activities governed by FACE have a substantial effect on interstate commerce. [T]he findings show that a national market for abortion-related services exists in this country and that reproductive health clinics are directly engaged in interstate commerce. The findings further demonstrate that a national movement engaged in the activities proscribed by FACE has decreased the availability of abortion-related services in the national market and caused women seeking services and physicians providing services to travel interstate. Accordingly, the activity proscribed by FACE has a substantial effect on the interstate commerce of reproductive health services.

*United States v. Gregg*, 226 F.3d at 262-63 (parallel citations omitted).

Similarly, in *Norton v. Ashcroft*, 298 F.3d at 556, the Sixth Circuit rejected the argument that the *Morrison* decision somehow invalidated "the uniform body of cases" upholding the FACE Act against Commerce Clause challenges. The Sixth Circuit adopted

-10-

the Third Circuit's analysis in *Gregg*, including the *Gregg* court's examination of the extensive Congressional findings concerning the FACE Act. *See id.* at 556-59.

In *United States v. Bird*, 410 F.3d at 634, the Fifth Circuit stated simply that it did not find that the Supreme Court's decision in *Morrison* materially affected its prior holding in *United States v. Bird*, 124 F.3d 667, that the FACE Act was a valid exercise of authority under the Commerce Clause.

Here, the defendant has not offered any novel argument or articulated any valid reason for this court to depart from the binding precedent of *United States v. Dinwiddie* and *United States v. Hart*. Accordingly, I recommend that the district court deny his motion to dismiss for lack of jurisdiction.

### C. Motion to Dismiss (First Amendment; Equal Protection)

The defendant contends that the FACE Act violates the United States Constitution in that

- It violates, both facially and as applied, the freedom of speech as protected by the First Amendment; and

- It violates, both facially and as applied, equal protection as required by the Fifth and Fourteenth Amendments.

A statute that regulates speech or conduct "based on hostility–or favoritism–towards the underlying message expressed" is content based. *R.A.V. v. St. Paul,* 505 U.S. 377, 386 (1992). Generally, a content-based statute is unconstitutional unless it survives strict scrutiny, which requires the government to prove that the statute "'is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Whitton v. City of*

-11-

*Gladstone,* 54 F.3d 1400, 1408 (8th Cir. 1995) (quoting *Perry Ed. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983)).

*United States v. Dinwiddie,* 76 F.3d at 921.  The Eighth Circuit precedent specifically governing this issue appears in *United States v. Hart*, 212 F.3d at 1073:

> [Hart presents] facial challenges to the constitutionality of the FACE Act. First, Hart claims that his indictment violated the Free Speech Clause of the First Amendment. Briefly, Hart argues that, because the FACE Act targets antiabortion activists, it imposes an impermissible burden on the exercise of speech based on its content. Hart asserts, in the alternative, that even if the FACE Act does not attach a content-based restriction on speech, [his] placement of the Ryder trucks at the entrance of each abortion clinic constituted expressive conduct, which is protected by the First Amendment, even where it is intimidating. *See* Brief for Appellant at 19 (citing *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886 (1982) (protecting political expression, even where it has the effect of intimidation); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,* 502 U.S. 105 (1991) (protecting offensive or emotionally unsettling speech)). We disagree.

> In *United States v. Dinwiddie,* 76 F.3d at 923, this court held that the FACE Act does not impose content-based restrictions on speech; rather, it prohibits the obstruction of reproductive health services without regard to the issue motivating the speech. That the FACE Act disproportionately impacts anti-abortion protestors does not transform its prohibitions into content-based restrictions. *Id.*; *see also United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998) (per curiam), *cert. denied,* 525 U.S. 1071 (1999). Furthermore, although the FACE Act prohibits "threats of force," to which an expressive element may attach and warrant some First Amendment protection, the government may limit such expression subject to intermediate scrutiny. *See United States v. Dinwiddie,* 76 F.3d at 923-24. With respect to the FACE Act, this court has already held that the government has a significant interest in protecting those seeking reproductive health services and in ensuring the availability of reproductive health services, and that the government's interest is not related to restricting free speech. *See id.* at 924. The FACE Act is narrowly tailored because it imposes criminal liability for only three types of activities: uses of force, threats of force, and physical obstructions. The FACE Act survives Hart's First Amendment challenge.

(Parallel citations omitted).  Despite binding authority to the contrary, the defendant once again[5] contends that the FACE Act is content-based and, therefore, subject to strict scrutiny in light of *Hill v. Colorado*, 530 U.S. 703 (2000).

In *Hill v. Colorado*, the Court upheld the constitutionality of a Colorado state statute making it unlawful, within regulated areas, for any person to "knowingly approach" within eight feet of another person, without that person's consent, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person ...."  While the statute prohibited speakers from approaching unwilling listeners, it did not require a standing speaker to move away from anyone passing by. Nor did the statute place any restriction on the content of any message that anyone wished to communicate, either inside or outside the regulated areas. The statute did, however, "make it more difficult to give unwanted advice, particularly in the form of a handbill or leaflet, to persons entering or leaving medical facilities." 530 U.S. at 707-08.  The question before the Court was "whether the First Amendment rights of the speaker are abridged by the protection the statute provides for the unwilling listener."  *Id*. at 708.

Opponents of the Colorado statute sought a declaration that the statute was facially invalid because it interfered with their practice of engaging in "sidewalk counseling" on the public ways and sidewalks within 100 feet of the entrances to facilities where human abortion is practiced or where medical personnel refer women to other facilities for abortions.

---

[5]Similar arguments were raised, and rejected, in *United States v. Weslin*, 156 F.3d 292 at 277.

They further alleged activities such as "sidewalk counseling" frequently entailed being within eight feet of other persons; and their fear of prosecution under the new statute caused them "'to be chilled in the exercise of fundamental constitutional rights.'"  *Id.* at 708-09.  The Supreme Court, however, determined that the Colorado statute was content-neutral:

> As we explained in *Ward* [*v. Rock Against Racism*, 491 U.S. 781 (1989)]:
>
> > "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.*, at 791.
>
> > The Colorado statute passes that test for three independent reasons. First, it is not a "regulation of speech." Rather, it is a regulation of the places where some speech may occur. Second, it was not adopted "because of disagreement with the message it conveys." This conclusion is supported not just by the Colorado courts' interpretation of legislative history, but more importantly by the State Supreme Court's unequivocal holding that the statute's "restrictions apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech." Third, the State's interests in protecting access and privacy, and providing the police with clear guidelines, are unrelated to the content of the demonstrators' speech. As we have repeatedly explained, government regulation of expressive activity is "content neutral" if it is justified without reference to the content of regulated speech. *See ibid.* and cases cited.

*Hill v. Colorado*, 530 U.S. at 719-20 (parallel citations omitted).

The same analysis was employed by the *Dinwiddie* court in 1996, and in a post-*Hill* decision, *Frye v. Kansas City Missouri Police Dep't*, 375 F.3d 785 (8th Cir.), *cert. denied*, 544 U.S. 920 (2005), in which the court held that police officers were entitled to qualified immunity from liability for arresting abortion protestors for creating a traffic hazard:

-14-

[The protesters/appellants] argue that, here, the police officers' restrictions were content-based, not content-neutral.  In particular, appellants argue that the district court ratified the police officers' improper use of a "heckler's veto," reasoning that the police officers imposed the restrictions based on the motorists' adverse reactions to the large photographs of mutilated fetuses by the side of the road.  It is true that "[t]he right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience."  *Hill v. Colorado,* 530 U.S. 703, 716 (2000) (*Hill*).  However, "'[i]t may not be the content of the speech, as much as the deliberate verbal or visual assault that justifies proscription.'"  *Id.* (quoting *Erznoznik v. Jacksonville,* 422 U.S. 205, 210-11 n.6 (1975)).

Thus, we must determine whether the police officers' conduct in placing restrictions on the display of the large signs displaying photographs of mutilated fetuses was based on the content of appellants' anti-abortion message, or on a content-neutral factor.  "'The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'"  *Id.* at 719 (quoting *Ward,* 491 U.S. at 791).  In other words, "[t]he government's purpose is the controlling consideration."  *Ward,* 491 U.S. at 791.  In addition, "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages, but not others."  *Id.*

*Frye*, 375 F.3d at 790 (parallel citations omitted).

In another post-*Hill* decision, the Eighth Circuit held that a Lincoln city ordinance prohibiting focused residential picketing in a defined zone was content-neutral.

The government cannot regulate speech because it disagrees with the message conveyed.  *See Ward v. Rock Against Racism,* 491 U.S. 781 (1989).  After oral argument in this case, the Supreme Court reaffirmed that "government regulation of expressive activity is 'content neutral' if it is justified without reference to the content of regulated speech."  *Hill v. Colorado,* 530 U.S. 703 (2000)*; see also Ward,* 491 U.S. at 791, 109 S.Ct. 2746.  Lincoln does not disagree with a particular message; the ordinance applies equally to anyone

> engaged in focused picketing without regard to his message. Because Lincoln's justification for the ordinance is the protection of residential privacy and tranquility and has nothing to do with the content of the regulated speech, the ordinance is content-neutral.

*Thorburn v. Austin*, 231 F.3d 1114, 1117 (8th Cir. 2000). *See also McGuire v. Reilly*, 260 F.3d 36, 43-44 (1st Cir. 2001) (applying *Hill* and holding that the Massachusetts Reproductive Health Care Facilities Act was content-neutral).

As to the defendant's assertion that the FACE Act violates equal protection, I defer to the First Circuit's analysis in *McGuire v. Reilly*:

> Without developing the argument in detail, the plaintiffs ... conclusorily assert that the Act violates the Equal Protection Clause. Because the equal protection interests involved in the differential treatment of speech are inextricably intertwined with First Amendment concerns, *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95 (1972), and the plaintiffs do not develop the point separately, we treat this assertion as part of the plaintiffs' First Amendment challenge. In all events, it need not occupy us for long.
>
> From time to time, the Supreme Court has invoked equal protection rather than free speech, as the basis for invalidating a content-based speech restriction. *E.g., Carey v. Brown,* 447 U.S. 455, 459-63 (1980)*; Mosley,* 408 U.S. at 94-95. But where the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily passes the rational basis test employed under the Equal Protection Clause. *See Thorburn v. Austin,* 231 F.3d 1114, 1122 (8th Cir. 2000)*; Hoover v. Morales,* 164 F.3d 221, 227 n.3 (5th Cir. 1998)*; DLS, Inc. v. City of Chattanooga,* 107 F.3d 403, 411 n.7 (6th Cir. 1997). So it is here: the Act passes muster under the Equal Protection Clause for the same reasons that it passes muster under the First Amendment.

260 F.3d at 49-50.

In *Dinwiddie* the Eighth Circuit held that the FACE Act was content-neutral, observing that the statute "would prohibit striking employees from obstructing access to a clinic in order to stop women from getting abortions, even if the workers were carrying signs that said, 'We are underpaid!' rather than 'Abortion is wrong!'" *Dinwiddie*, 76 F.3d at 923 (cited with approval in *Norton v. Ashcroft*, 298 F.3d at 553 and *United States v. Weslin*, 156 F.3d at 297).

Considering the authorities cited by the defendant, I can ascertain no legally principled reason why this court should "reconsider" or disregard the Eighth Circuit's precedential decisions in *Dinwiddie* and *Hart*. Accordingly, I recommend that the defendant's motion to dismiss be denied.

---

**ORDER**

**IT IS ORDERED** that Defendant's Motion for Bill of Particulars [20] is denied.

Pursuant to NECrimR 57.2, a party may appeal this order by filing a "Statement of Appeal of Magistrate Judge's Order" within ten (10) days after being served with the order. The party shall specifically state the order or portion thereof appealed from and the basis of the appeal. The appealing party shall file contemporaneously with the statement of appeal a brief setting forth the party's arguments that the magistrate judge's order is clearly erroneous or contrary to law. The filing of a statement of appeal does not automatically stay the magistrate judge's order pending appeal. *See* NECrimR 57.2(d).

---

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Dismiss for Lack of Jurisdiction (Commerce Clause) [18] and Defendant's Motion to Dismiss (First Amendment & Equal Protection) [24] be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED December 18, 2006.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-18-